And all those seated, before we begin, we will observe a few moments of silence in memory of our departed President Ronald Reagan. Thank you. The cases will be called off the calendar in the order in which they are listed. The first is United States v. Wright and Hamilton. Counsel, you may begin. Good morning. Richard Rome appearing for Mr. Hamilton. He's splitting the time with Co-Counsel Verna Weithalt. This case arrives here after a second, a remand after an original suppression hearing where the Court had denied an exclusionary to exclude evidence. And then in the meantime, it was brought to the attention that the Chief Investigating Officer on the case had committed witness tampering. So this Court ordered a further hearing to determine what the effect of that would be, and it ended up in front of the District Court again. The first issue I would like to address with respect to that is whether the defendants were denied their fair rights because their discovery was limited on that remand hearing. It's clear that in order to have had a full and fair hearing at the remand, that there should have been further discovery allowed with respect to the officer who had been convicted of witness tampering. You know, the bottom line seems to me to be that the critical testimony was all cooperated either by other officers or by the manager of the hotel. It is the presence of the Home Depot receipt and the van, the fact that the door was open, the fact that officers could smell chemicals coming out of the door, and so forth. So why is Boss's, or however his name is pronounced, testimony in any respect material? Well, first of all, he was the lead officer on that case. Plus, there were numerous discrepancies with respect to the other testimony. For example, one officer who testified about the door said it was slightly open. Another officer said it was wide open. Well, so what? If it's slightly open, you can still smell. I mean, it doesn't matter. It was open. A little, but it was open. I mean, and other people testified to it, is really my point, whether they testified that it was slight or great. Well, then I think because of the way this case evolved and some of the discrepancies, that that was why it kind of ties in with why there was discovery that was needed, to find out if this officer had been involved in any other kind of sampling. Yes, but assuming he had been, why would it have been material in this case given the other testimony? Because he, the question is whether these other officers would have been influenced by this officer. And there was so much discrepancy down below in the lower court where the receipt for this PC tubing, for example, was found, when it was found, how it got into the car. There was testimony that that receipt was in the hotel room. How did it get back? What discovery did you ask for that you were denied? Well, there was a general discovery request made. I think, though, and to focus on what was really important, is what came out during the remand hearing. Well, no, no, no, no. I want to back up. A general discovery request that was denied. See, when you say you were denied discovery, I want to know in particular what you were denied access to that would be material or relevant. I think the specific thing that was crucial that was denied was the 52 files that the investigating officer had been involved in on drug transactions. And what was important about that is that that wasn't a wild request. That was put into issue by the government. The government notified the defense of that. The government put at least two witnesses on the witness stand regarding a review of these files. It turned out one officer didn't want to review it because he thought he had a conflict of interest. He's the officer that just glanced at them, and because he was involved as a supervisor, passed them on? That's right. One officer glanced at them. Another spent at most an hour looking at 52 files. But they brought it up. I mean, they put that into issue. Now, you asked specifically to see the files yourself? Well, trial counsel specifically asked, yes, to review those and or to have an investigator appointed. What I can't understand is how the files disappeared. Am I correct in reading this record that the files disappeared from a prosecutor's office? Well, the last part of it, there was testimony that they didn't know where they were. That's correct. Who's the they who didn't know where they were? The officers. And what did the government have to say about that? Who was the prosecutor that supposedly had these files? Who was the prosecutor? I think it was, I think it might have been this prosecutor. But I don't know, I can't remember at that hearing what the response was to the statement that they're missing. I can't remember that specific part of the transcript. But the defense was willing to wait and have them go find them, or the hearing could have been continued. But to me that was important because otherwise we have to think that this officer all of a sudden started on witness tampering at this certain point in time in the year 2000. And the question is, was there other information that might have been relevant that could have affected the testimony of the other officers? And since it was put into the case by the government, there's no reason why the defense should not have been allowed to look at those. And that was the most specific and important piece of information to be specific with your question. The other was there was a request to bring in another witness to testify by the name of Ramirez, and the defense wanted to get him there to testify and ask for a two-week, ask for the hearing to be put over, not the entire hearing, but to have another day of hearing two weeks later to have Mr. Ramirez testify. If I understand the sequence of events, the possibility of Mr. Ramirez's offering testimony came up, I don't know, like in February. I don't know. I don't remember the exact time sequence, but it was at least two or three months later when the continuance was requested. Again, without having produced Ramirez in that period of time, which could have been, and without any particular proffer about what he would have said. That's true. There was a little lag time, and it does appear that the defense might have been a little lax in trying to get him, although the defense attorney did state that he had a catheter issue, and that was the reason that he didn't. Well, a little lax is putting it mildly. I mean, the court said you can have Ramirez testify, but it's up to you to get him, and then nobody got him. That's right, and I think the defense lawyer had a health problem, and the problem is to punish the defendant because the defense lawyer might have been a little, they could have just put it over for one other half day of hearing in another two weeks. It wouldn't have really been an inconvenience to any of the parties. But there's no showing that Ramirez knows anything anyway. This letter is very vague in general. It's true. The letter is vague, but that would have been the second specific piece of evidence. But even without Ramirez, I think the key thing was the 52 files, particularly since the government put in testimony that Mr. Boss had no criminal record going back to 1995, based on their review of personnel files and other information. So at the very least, that could have been reviewed. It might have shown some irregularities. The 1995 date comes from a declaration that the government. So what are you asking us to do? Remand the case in order for the district court to order the files in and turn them over to you? Is that basically what you want? I think that would be, yes, to have somebody review those 52 files. That's correct. Have trial counsel review those 52 files. The other issue, of course, goes to the effect of the Boss conviction. And if this court was to find that, it tainted those proceedings. And, of course, we would ask to have the evidence excluded. Then we would never have to look at the 52 files. And there were just so many things that occurred with Mr. Boss aside from his witness tampering. There was a pattern of, I mean, just for example, his motive when he said why he witnessed tampered. I mean, it's so preposterous that it really makes the case. Yeah, well, the difficulty, as you understand, is that we are an appellate court. This was remanded for hearing. A hearing was held, and we have findings by a court on credibility overall and saying that problems with Boss don't make any difference because, as Judge Reimer said earlier, everything is corroborated by other witnesses, and I credit those witnesses. We don't have any leverage at all to undo those credibility findings. But there's so many discrepancies that it really, I think what it probably comes down to is. You're asking us to redo what the trial courts do, not what an appellate court does. But when we have a witness tampering, there are some cases that just don't smell right. And it might have been this court or one of the judges that, you know, when a case smells like a dead fish. Trial courts can smell that. We can't. I mean. I think we can smell it. Moses in here. I think we can smell it oozing up from the trial court. But there were so many irregularities with Mr. Boss. And, I mean, one of the logical things, I think, if the court would just. It's always bothered me in the case. I understand the reweighing and all this, but it's so illogical for two defendants to have been cooking meth in a hotel room, knowing there's police outside, to walk out of the room and leave the door wide open so they could smell it. You're asking us to assume that people who cook and use meth are illogical? Well. I mean, that's a pretty tough assumption. But it might not even be logical. I think it's just common sense. Were they supposed to stay in there forever? Well, no. They're just supposed to close the door like they probably in this case did. And there was a lot of testimony that their door was closed. And I know the court can't reweigh the evidence. But I think when you have a case like this, at the very least, we need to have, I think, the 52 files could be reviewed. And it might show something and it might not. You want to share time with your. I would. I'd like to share time. And we'll probably reserve some time, too. But thank you. Thank you, Counsel. Bernard Liefeld on behalf of Richard Wright. The issue in this case, obviously, is the validity of his waiver of the right to appeal his sentence. And given, in light of the information that came out about Douglas Boss, and the fact that the government doesn't really dispute that when there was the remand hearing, Mr. Boss's testimony was not credible. The government doesn't argue. In fact, I think the government puts it as unconvincing, his justifications for why he did what he did. I think in this case, the matter should be remanded to the district court for a hearing on whether or not Mr. Boss's conviction and subsequent revelations that he was a habitual liar would affect the court's decision to deny acceptance of responsibility, which I think is a very different issue from the denial of the suppression motion, because the court's original ruling on the suppression hearing was that even if there were false testimony, there was still probable cause. But when it comes down to the acceptance of responsibility, there could be a significant difference there, and there would be an opportunity for Mr. Wright to be. I'm not sure I'm with you. How could somebody else's conviction bear on Wright's contrition? The district court or the probation officer originally found that Mr. Wright was contrite and recommended acceptance of responsibility. I understand it was denied, but I mean, how could what happened to somebody else bear on what he himself did? Right, because the issue came down to, for the judge, in denying acceptance of responsibility, is who was telling the truth at that suppression hearing, Mr. Wright or Mr. Boss. And at the time that the court decided not to give him acceptance of responsibility, people were not – no one was aware of Mr. Boss's true character, because it's not simply that he committed witness tampering, but that he revealed himself to be a very thoroughly dishonest person. And when he testified at the remand hearing, he didn't show his contrition either. He admitted that he had committed this offense, but he told stories that were preposterous on the witness stand, and the government doesn't dispute that. So I think that in light of that, had Mr. Boss's true character been revealed at the time, the court might not have denied him acceptance of responsibility and might have found that. And that's what I would ask the court to remand for a hearing on whether or not Mr. Boss would now be entitled to acceptance of responsibility. Is there any other questions? None at this point. Thank you. Good morning. May it please the Court. My name is Elaine Liu, and I represent the government. I'd like to briefly address Defendant Wright's waiver of appeal issue before turning to the merits. Defendant Wright knowingly and voluntarily waived his right to appeal, his conviction, and also the district court's ruling on the suppression motion in a written plea agreement. Nobody's mentioned it, but his plea agreement does have an exception for a claim of newly discovered evidence. Why is it that this wouldn't fall within that exception? I believe that in his plea agreement where that phrase appears, it's to bring a claim of a 2255. So you don't think it applies to an ordinary appeal? A direct appeal, no. Okay. Does it say that? Yes. Does it specify 2255? It's to bring a sentence that has to do with post-conviction attack. And so you infer that that's what it is. Yes, Your Honor. That's what I infer it from. Okay. So in your view, there's nothing that prohibits him from bringing a 2255, raising the identical issues that are raised today? Yes, Your Honor. In a 2255. Right. I mean, that brings me to a jurisdictional question I was going to ask you about later, but it's a natural segue now. I'm not sure that I quite understand how we got here, and I'm not quite sure that I'm persuaded that we have jurisdiction in the case and would like your view. This came as a result of a certification on a new trial motion request by the district court saying that the district court was willing to entertain that. We didn't have a trial. I have to answer. I could correct the question. It was not a new trial motion. It was a motion for a limited remand. Right. But it was based on our case that talks about a motion for a new trial, Rule 33, as I understand it. And under that case, if you look at it carefully, it doesn't apply to guilty pleas, and we've said this procedure doesn't necessarily, isn't necessarily available in those kinds of cases. So it seems to me in looking at it all, the proper remedy all along was 2255. We don't have a COA in this case, if that's true. We don't have jurisdiction, do we? Your Honor, I guess the reason I did not raise that argument earlier and why we did not oppose the remand was because this evidence was discovered during defendants' dependency of their appeals. Right. We thought that out of fairness, I thought that out of fairness to the defendants, why not let them go down and have one more crack at the district court to see if the district court would have changed its credibility rulings with respect to all the witnesses after learning about Foss's conviction? I understand that. I appreciate the government's position. And, of course, our panel agreed with you and sent it back down. But here we are, and now you're arguing that 2255 is their only remedy, and this is going to have to occur again on a 2255 motion. So I wouldn't raise it at all except that it is jurisdictional. And I know you weren't prepared to – I didn't raise the issue earlier, so I fully appreciate it if you don't have a response for me now. I'm sorry, Your Honor. Thanks. Your Honor. What did you understand by the language, this case is remanded to the district court for the limited purpose of enabling that court to hear evidence as necessary, amend its order, denying appellee's motion suppressed based on these findings? Within 45 days, appellant shall file either the opening brief or a status report describing the status of the district court proceedings. If the appellant files the opening brief, the answering brief is due, et cetera, et cetera, et cetera. What did I understand that to mean? I understood that to mean that the government did not oppose the remand and the defendants would be able to go back before the district court and try to convince the district court to change its ruling on suppression motion. However, by doing that, the government did not waive its right to ask this court to enforce the waiver of appeal in defendant rights plea agreement. And, in fact, all of his claims here, even relating to the discovery and the denial of his request for continuance, those all relate back to the denial of his suppression motion. So your view was that the remand sort of suspended the act of appeal and then we're back here again on the same appeal? Yes, Your Honor. Okay. And just to respond briefly to one point that counsel made, that the defendant rights waiver was not knowing or voluntary because he didn't know that Baas would later commit these offenses, first of all, that's not a legally cognizable claim because that amounts to he's saying that he didn't have all the impeachment material available at the time of his guilty pleas. And under Ruiz, that's not a legally cognizable claim, so that even if the government had somehow been clairvoyant and could have foreseen that Baas would commit crimes in the future and withheld that evidence, it still would not have formed a basis for him to appeal the suppression motion. And, moreover, more generally, in Tollett, the Supreme Court case cited in the government's brief, in that case the defendant there did not know at the time of his, of entering his guilty pleas, that African Americans had been excluded from the grand jury. And so he didn't know the facts forming the basis for his, what he later tried to raise on appeal. And, therefore, in Tollett,   And, therefore, in Tollett, the government court said that his guilty pleas, even though it was irrelevant, that his guilty pleas foreclosed inquiry into that matter. Right. I mean, that's why I think it's, it seems to me this whole episode should have been handled on 2255 because you can't withdraw a guilty plea after sentencing. That's our case law. And that was the natural result. If the district court had granted the suppression motion, that's the natural result, at least as to right. Now, Hamilton had a conditional waiver, so that may be a different circumstance. Anyway. Your Honor, the government submits that the defendant's request for further discovery should be measured in the context of the abundant materials that were made available voluntarily to the defendants. All information, the information in the plea agreement, And not only that, the government moved to unseal the district court file. The government voluntarily produced the search warrant in Baugh's case, detailing the investigation, including Baugh's financial motives for committing this offense, the affair that he had that apparently led to his credit card debt and his travel and other procedures for his girlfriend. Who initiated the process of examining these 51 or 52 files? Well, the defendants had asked for it at the first hearing. At the conclusion of that hearing, I told the agent who was there to go and see if they were still in existence. And frankly, the government would have produced them if they were still in existence, not because defendants were entitled to them and not because there would have been anything material in them, but just out of the So hold on a second. So you ask an agent, who was the agent?  And whose department did he belong to? DEA. So what did he do? Well, according to, I don't think that I spoke with him again, but the other agent who appeared at the second remand hearing testified, and that's David Smith, testified that after the first remand hearing, John Seaman had called him and asked him where were the files, and the two of them went to the prosecutor who handled the Baugh's case, went to her office to go try to locate those files, and that's where they had left them, and they couldn't find them anymore. And who was that? Who was? The prosecutor. Her name is Rebecca Lonergan. And who did she work for? The same office that I work for. And your office lost 52 files? Your Honor, this should Did your office lose 52 files? Apparently, however, this remand, the remand procedures were in February and April of 2003. Baugh's was convicted in July of 2001. So this was nearly two years after that case had been prosecuted. What's your retention policy? When we close files, frankly, Your Honor, when we close files, we give it to the secretaries, and I believe they generally retain correspondence and things that are not publicly filed. These weren't federal files, though. They were state files, weren't they? Well, the agents testified that during the Baugh's investigation, they had asked the internal affairs officer at Ontario Police Department to pull all the files that Baugh's had offered. Those were Ontario Police Department files? Yes, Your Honor. And so they were turned over to the federal government? During the Baugh's investigation, yes. How was he convicted? By a plea? By guilty plea. By guilty plea? Pre-indictment guilty plea. He pled to an information. And so then your office lost all these files? Apparently, Your Honor. What did you do to try to find them? I didn't do anything to try to find them, Your Honor. I don't know if I – it was brought to my – I don't recall when it was brought to my attention that the 51 files were no longer in use. Did you feel that you had a Kyles v. Whitley obligation to track this down and see whether Baugh's had infected this case with the false information? I did my best, Your Honor, but there was no reason to – again, the only reason I asked them to look for these 51 files is not because I suspected that something would be material in them, but just out of an abundance of caution to give it to them. Why did you oppose the evidentiary hearing? Which evidentiary hearing? On remand. You mean that – The record says you opposed the evidentiary hearing that they asked for on this whole issue, the evidentiary hearing that was then held and we're here talking about. I don't – I know that I opposed having Officer Baugh's come in to testify because he – Why? Well, he was in custody and I didn't think that there was – I didn't think that there was a showing that he would be able to give more information than what was already turned over. So the government left the entire burden with the defense to try to figure out whether Baugh's had done anything bad in this case? No, we didn't. We turned over many materials that – and I spoke to the prosecutor and I made sure – I asked her to make sure that anything that could be possibly exculpatory or jiggly-o against Baugh's be turned over. But you didn't examine the files because they were lost and they remain lost today. So even if we remanded, there's no files? They could be reconstructed, Your Honor, truthfully. Probably. They're in Ontario Police – they were reconstructed in the first place by the Ontario Police Department. In all likelihood, they probably still have those reports. But there is no reason to do that in this case, and that is because the defendants did have abundant materials available to them that the government voluntarily disclosed. They did get an evidentiary hearing extended over two days where not only the – both of the case agents who testified – who investigated Officer Baugh's were extensively cross-examined and asked about all the details of the investigation. What did the government do when the Ramirez letter came to light to check out what Ramirez might know about this? I have additional information regarding Baugh's credibility I'd be glad to share with you. Did the government do anything to check that out? I did not seek to interview – no, I didn't. Why not? There was – I felt that the letter that the defendants produced was woefully inadequate to show that Ramirez would have something material to say. At the first hearing, which is when it was first raised, defendants – the testimony of Wright was that it had something to do with evidence and something to do with the search warrant. There wasn't even any allegation that Baugh's had perjured himself in that case. There were just no details. I have talked to Richard Wright and have a similar experience with Baugh's – similar experience to Baugh's creating evidence, manufacturing evidence, falsifying evidence. Well, in any event, Your Honor, at the end of the first remand hearing, the district court ordered that Ramirez would be made available and could testify at the second hearing as long as the defendants transported him to the hearing. So whatever information Ramirez had to provide, the government assumed that because the court had granted their request to make that information come out, I didn't take anything. You weren't interested in what Ramirez had to say. I was prepared to address it when he appeared at the hearing – at the second remand hearing. I gather no communication was had between your office and the Ontario Police Department to see whether the files might have been returned to them.  You know, it's kind of distressing because our history is littered with cases of bad police. Ninety-nine percent of the police do what they're supposed to do. But if you look back over history, you find a whole series of cases where officers have manufactured evidence for one reason or another. And here we have a case, obviously, with a bad officer. I doubt that you believed anything that he said about what he was doing. This is probably not the first time he's done this. You know, he got caught doing something like this. And so, yes, you're right, we do have a record where a district judge has looked at all this and made credibility findings. But it would seem to me that under all the Supreme Court cases of which you're clearly aware, the government has an obligation to track this down, not simply lose files and not really be interested in what Ramirez has to say about Boas. Well, Your Honor, the agents who investigated Boas did conduct an investigation into – I mean – One agent glanced at the files and didn't want to have anything to do with it because he was the supervisor. He says, I glanced at them. No. Agent Seaman testified that it was in their interest and they did want to find out if Boas was – before October of 2000 involved any prior incidents of misconduct. And those 51 files, that's not the only possible avenue to explore that. The agents testified about other avenues that they did explore to make themselves comfortable that there wasn't any prior misconduct by Boas. They reviewed his financial records going back a year. They found out about Boas' misconduct in November 2000. So the records that the IRS looked at went back to approximately November 1999. That's two months after the suppression hearing in this case. They looked at his credit card history and found that it got out of control only in the first six months of 2000. They looked into criminal inquiries that Officer Boas had conducted. They looked at telephone toll records going back a year to see if Boas had made contacts with any other targets of other investigations. They interviewed his friends on the task force to figure out what motives and why he committed this offense and why he committed it when he committed it. And they did find a logical explanation for why he committed these offenses, and that was that he was in a financial crunch, which did not – which the situation only developed in the first six months of 2000 when they looked at his financial records. That's when he generated these credit card bills, and it was because he started having this affair with this woman, and they took many trips, and he had many other expenses related to that affair. So they did find a very logical explanation for why Boas committed this offense when he did, and no evidence of prior misconduct by him. And in addition to that, the Ontario Police Department Internal Affairs Officer, he testified that the government did ask him to review – he said that he did not closely review the 51 files because he felt uncomfortable he had signed off on those. However, he did testify that he did review Boas' personnel files and his background and training files, and he testified that if there were sustained allegations of misconduct, they would have been retained in Ontario Police Department's personnel files for at least five years. And that's at Hamilton's excerpts of record 423 to 24, 437 to 438. And even – he also testified that even if there were allegations against Boas that were not sustained, those would not – even though they wouldn't appear in Boas' personnel files, they would appear in the Ontario Police Department's internal affairs files for five years. So even if there had been some allegations that were made against Boas that were not sustained, that should have surfaced in the government's investigation. And finally, that Ontario Police Department officer, he also testified that as one of the two internal affairs supervisors in Ontario, if there had been any complaints of planted evidence or perjury against Officer Boas, that would have been brought to his attention, and they were never brought to his attention. And that's at Hamilton's excerpts of record 436. And finally, Your Honor, it's – well, two more points. It's hard to imagine what additional impeachment material could have been gleaned from these 51 files. The agent, David Smith, who said that he reviewed these for an hour, he said that he reviewed them for an hour because they're not very helpful without much other information, and it's not clear why just a review of these records would allow defendants to glean that Officer Boas had improperly handled cases in the past. And finally, even assuming that the defendants thoroughly impeached Boas with his prior mishandling of cases, even assuming that those 51 files were reconstructed today and turned over to the defendants, it would still not be material because at the remand hearing, they were armed with lots of discovery, and they conducted thorough and vigorous examination of the witnesses, and they did expose multiple problems with Boas's credibility, at least after October 2000, his criminal history, his conviction for witness tampering, his lies about his son having leukemia during the investigation, his financial motivations. But the district court noted that there were multiple other witnesses who corroborated Boas's testimony on crucial facts, and so the district court did not have to rely on Boas's credibility in making its factual finding that there were no false statements in the search warrant affidavit. There is – counsel has suggested that the other officers may have perjured themselves, too, but there's no basis for finding that. The two other officers independently testified as to the crucial facts at the suppression hearing. With regard to the Home Depot receipt, Dufour testified that he first saw that receipt  which proceeded when they entered the room. And as for the even more important fact of whether the door was open or closed and whether there was an odor emanating from that room, there were four other witnesses who corroborated Boas on that fact. The two other officers testified that the door was open, and yes, one officer testified that it was slightly ajar, and one officer testified that it was wide open, but I would suggest to this court that, if anything, that suggests that these officers did not get into a huddle to get their stories straight. And both of those officers also testified that they smelled the chemical odor, and there's no reason whatsoever here to suspect that those officers perjured themselves. And the hotel manager, Philip Goh, he corroborated the officers' testimony substantially. He testified that this was the type of door that did not slam shut automatically. You had to pull it to get it to be shut tight. And he also testified that if the defendants had really pulled the door tight, as they claimed, then the door would have locked automatically. And he also testified that he never saw any damage to the door, which meant that the officers had to have gotten into the room without a key, because he also testified that the officers never asked him for a key. He offered a key to them, and they turned him down. They said that they didn't want it. They didn't need it. And he said that as the manager, as the only manager on site, he's usually the one who makes the decision as to whether to give officers keys to hotel rooms, and he never authorized anybody to give keys that day. And the housekeeper, who also testified, likewise testified that she did not give the key to any of the officers. And whatever cynical view of law enforcement may be engendered by police officers like Douglas Baas, there's no conceivable reason why the hotel manager and the housekeeper would have perjured themselves. There's just no explainable motive for that. And their testimony establishes that the officers could not have gotten into that room without a key, and if the door was shut, as the defendants had contended. This Court, and for that reason, this Court can take comfort with the knowledge that the district court did not clearly err in finding that there were no false statements in the search warrant affidavit, and that the discovery would not have been material because the district court has already made clear that it did not have to rely on the credibility of Officer Baas in making its factual findings. Do you have any other points you'd like to make or time has expired? I'll conclude my remarks here then, Your Honor. Thank you, Counsel. Just a couple of points, and I think Co-Counsel wants to make a couple of points briefly. One of the reasons why I think that discovery that we were requesting was needed was because part of the reason the Court denied any change in the ruling was that the Court found that all of the material that it had in the affidavit that it had in front of it occurred after the relevant dates in the case. In other words, the judge said, we don't have any reason to believe that he lied prior to what's relevant, which was the date of the declaration, the affidavit on the search warrant, and at the suppression hearing. So part of it, he says, this is all irrelevant because his witness tampering, et cetera, occurs after the fact. So I think that, just to point the date out, the time frame, I think it is important for the Court to realize that if the trial court had had some information that had preceded the relevant events, it might have taken a different look at the situation. And then just, it's hard to nitpick on some of the facts, but my recollection in my notes in the, as to what the manager of the hotel, when he was cross-examined, he said he didn't know if the door was open. It was in his declaration. But when defense counsel started asking him, he kind of stepped back. So it's all not as clear-cut to say, why would the manager, why would he have a motive to lie? I don't know, he signed a declaration, then when he was questioned about it, he backed off. I'll submit it.  Counsel wanted a minute or so. Thank you. In terms of the facts, the government said that there was no reason why Mr. Goh would have lied, but the manager of the hotel, that the cooperating co-defendant who was testified, called by the defense, she had refused to speak, to be interviewed by the defense before she testified. And she said that the door was shut, and that the officer boss said, I'm going to go get a key, came back and had one. And the other thing is, in terms of the discovery problems, last night I checked on Alexis just to see what happened with Mr. Ramirez's case, because it's an old docket number, 98. And I was surprised to find that his appeal is still pending in this court after 1998. There have been a couple of remands. The court can take judicial notice of the case. Are you asking us to take judicial notice of that number one and number two? So what? Well, the government appears to have, for years, some knowledge of what was going on in Mr. Ramirez's case. So I think that that is, and there was a, you know, and something to do with, according to the docket, it's just something to do with Brady, and a Anders brief was ordered to stricken, and the new counsel put into brief a suppression issue. I don't know if it has anything to do with Douglas Foss, but. We don't either. No, but, I mean, the government has had, you know, some knowledge of his case for many years. Thank you. Thank you, counsel. The case just argued is ordered submitted, and we'll call the next case United States v. Edward Johnson.
judges: Trott, Rymer, Thomas